IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| HARVEY J. CASS, | ) |
| Plaintiff, | ) 4:03cv3411 |
| vs. | ) MEMORANDUM AND ORDER |
| HAROLD W. CLARKE, et al., | ) |
| Defendants. | ) |

This matter is before the court on the Motions for Summary Judgment (filing nos. 59, 61 and 63) filed by the plaintiff, Harvey J. Cass; and the Motion for Summary Judgment (filing no. 64) filed by the remaining defendants[1] in this action, Harold W. Clarke, Fred Britten, Joseph Wilson, Darla Ziesset, M. Rose-Seeman (a/k/a Mikki Kirkpatrick), Jane Grabenstein-Chandler, Jeff Utecht, Theresa Predmore and Bruce Kramer. The plaintiff has sued the defendants in their individual and official capacities.

### The Plaintiff's Claims

The plaintiff, a former prisoner who has served his sentence, alleges that while confined at the Nebraska State Penitentiary ("NSP"), he forfeited good time credit as a result of a misconduct report falsely charging assault by the plaintiff on corrections officer Joseph Wilson. The misconduct report led to disciplinary proceedings on May 5, 2000, chaired by Corrections Officer M. Rose-Seeman, during which the plaintiff allegedly

---

[1] In filing no. 46, my Memorandum and Order of December 27, 2004, I dismissed defendants-Michael Johanns, Michael Kenney, and Frank Hopkins from this litigation. The plaintiff had failed to state a claim on which relief could be granted against those defendants, as liability under 42 U.S.C. § 1983 may not be founded solely on the basis of respondeat superior. I reaffirm and incorporate by reference filing no. 46 in this Memorandum and Order.

1

suffered violations of his right to due process. According to the plaintiff, no investigation or fact-finding occurred in connection with the misconduct report. Also, the plaintiff called six eyewitnesses, but only three were allowed to testify. The plaintiff spent time in segregation, and was not permitted to visit his dying mother. Finally, Fred Britten "signed the action sheet on May 5, 2000" (complaint at ¶ V), but Britten was not the official authorized under state law to deprive the plaintiff of good time or to impose the penalty of segregation.

## Background

Some of the issues raised in the pending summary judgment motions have previously been decided. For example, in filing no. 46, my Memorandum and Order of December 27, 2004, I explained that Heck v. Humphrey, 512 U.S. 477 (1994), and Edwards v. Balisok, 520 U.S. 641 (1997), do not provide a basis for dismissal of this litigation. The decisions in Heck and Edwards stand for the principle that "challenges to the validity of any confinement or to particulars affecting its duration are the province of habeas corpus," not civil rights litigation. Muhammad v. Close, 540 U.S. 749, 750 (2004). See also Sheldon v. Hundley, 83 F.3d 231, 233 (8th Cir. 1996): "If success on the merits of a particular § 1983 claim would necessarily imply the invalidity of a disciplinary result lengthening the plaintiff's prison sentence, Heck requires favorable termination of the action in an authorized state tribunal or a federal habeas court, even if the claim is for damages rather than earlier release."

Therefore, when success on the merits of a civil rights claim would necessarily implicate the validity of continued confinement for a convicted state prisoner, the inmate must first obtain a favorable outcome in a habeas corpus or similar challenge. Absent a

2

favorable outcome in a habeas corpus or comparable proceeding, a prisoner may not use 42 U.S.C. § 1983 to cast doubt on the validity of the fact or duration of his confinement. The plaintiff has never obtained a reversal or other favorable outcome in a habeas or similar challenge to the disciplinary conviction of May 5, 2000.

However, Heck and Balisok do not bar a civil rights challenge to prison disciplinary proceedings if the challenge would have no effect on the duration of confinement, e.g., no forfeiture of good time was involved or the inmate has served the prison sentence and has been released from custody. In either case, a challenge to discipline imposed during imprisonment cannot undermine the validity of *continued* confinement or affect the duration of custody. See Muhammad v. Close, 540 U.S. 749 (2004):

> Heck's requirement to resort to state litigation and federal habeas before §1983 is not, however, implicated by a prisoner's challenge that threatens no consequence for his conviction or the duration of his sentence.[FN1] There is no need to preserve the habeas exhaustion rule and no impediment under Heck in such a case, of which this is an example.

Id. at 751-52.

> [FN1] The assumption is that the incarceration that matters under Heck is the incarceration ordered by the original judgment of conviction, not special disciplinary confinement for infraction of prison rules. This Court has never followed the speculation in Preiser v. Rodriguez, 411 U.S. 475... (1973), that such a prisoner subject to "additional and unconstitutional restraint" might have a habeas claim independent of § 1983, and the contention is not raised by the State here.

Id. at 752 n.1. The plaintiff does not challenge the validity of the original criminal conviction which led to his imprisonment, and because he has been discharged from custody, his challenge to the subsequent prison disciplinary proceedings cannot affect the duration of his confinement. The defendants' reliance on Heck and Balisok is misplaced

when, as here, the plaintiff's civil rights claims do not implicate the validity or duration of continued confinement. Therefore, the defendants' arguments for summary judgment in filing no. 64 based on Heck and Balisok are overruled.

I have also previously decided other issues which will not be revisited in this Memorandum and Order. The first issue relates to monetary and injunctive relief; and the second addresses matters which exclusively concern state law.

### Monetary and Injunctive Relief

In filing no. 46, I noted that the Prison Litigation Reform Act ("PLRA") applies to this litigation because of the plaintiff's status as a prisoner when he filed the complaint. The PLRA bars the plaintiff from recovering damages for any kind of mental anguish or emotional distress arising from prison conditions unless the plaintiff also suffered a physical injury. See 42 U.S.C. § 1997e(e): "Limitation on recovery. No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." The plaintiff sustained no physical injury, and the only damages he alleges are in the nature of mental and emotional suffering. Consequently, no compensatory damages are recoverable by the plaintiff in this case.

In addition, the Eleventh Amendment to the United States Constitution bars the plaintiff from recovering monetary relief from the defendants in their official capacity. A suit against a public employee in his or her official capacity is treated as a suit against the public employer. Kentucky v. Graham, 473 U.S. 159, 165 (1985). The Eleventh Amendment bars claims for damages by private parties against a state, a state agency, or a state employee in his or her official capacity. See, e.g., Morstad v. Department of

Corrections and Rehabilitation, 147 F.3d 741, 744 (8th Cir. 1998): "[A]bsent a waiver, the Eleventh Amendment immunizes the state and its officials from § 1983 liability." No waiver applies to this litigation.

The PLRA does not preclude recovery of nominal or punitive damages from the defendants in their individual capacity, or declaratory and limited injunctive relief against the defendants in either capacity, if appropriate. In this case, however, injunctive relief is not appropriate as the plaintiff has been discharged from custody. No injunctive relief may be recovered to improve conditions at a prison from which the plaintiff has been transferred or released. "A claim for equitable relief is moot 'absent a showing of irreparable injury, a requirement that cannot be met where there is no showing of any real or immediate threat that the plaintiff will be wronged again.'" Randolph v. Rodgers, 170 F.3d 850, 856-57 (8th Cir. 1999). When "an inmate has been transferred to another institution, his claim for injunctive relief against the warden of the first prison to improve the former prison's conditions is moot." Id. at 857, *citing* Martin v. Sargent, 780 F.2d 1334, 1337 (8th Cir. 1985). The same is true after release from confinement. Thus any claim for injunctive relief in this case has become moot.

### State Law

The plaintiff contends that he was denied due process when Fred Britten signed the action sheet approving the plaintiff's disciplinary penalties. According to the plaintiff, because Fred Britten was not the Chief Executive Officer of the plaintiff's prison facility, Britten could not legally order forfeiture of the plaintiff's good time, and only Michael Kenney, the Chief Executive Officer of the plaintiff's institution, could order revocation of the plaintiff's good time. See Neb. Rev. Stat. § 83-4,114.01 (last amended in 1997):

(1) The chief executive officer of each facility of the department shall be responsible for the discipline of inmates who reside in such facility. No inmate shall be punished except upon the order of the chief executive officer of the facility, and no punishment shall be imposed otherwise than in accordance with this section.

(2) Except in flagrant or serious cases, punishment for misconduct shall consist of deprivation of privileges. In cases of flagrant or serious misconduct, the chief executive officer may order that an inmate's reduction of term as provided in section 83-1,107 be forfeited or withheld and also that the inmate be confined in disciplinary segregation. During the period of disciplinary segregation, such inmate shall be put on an adequate and healthful diet. An inmate in disciplinary segregation shall be visited at least once every eight hours. No cruel, inhuman, or corporal punishment shall be used on any inmate.

(3) The chief executive officer shall maintain a record of breaches of discipline, of the disposition of each case, and of the punishment, if any, for each such breach. Each breach of discipline shall be entered in the inmate's file, together with the disposition or punishment for the breach.

(4) The chief executive officer may recommend to the director that an inmate who is considered to be incorrigible by reason of frequent intentional breaches of discipline or who is detrimental to the discipline or the morale of the facility be transferred to another facility for stricter safekeeping and closer confinement, subject to the provisions of section 83-176.

In Martin v. Nebraska Dept. of Correctional Services, 671 No.W.2d 613, 618-20 (Neb. 2003), the Nebraska Supreme Court stated, in pertinent part:

We next turn to the State's argument that the district court erred in concluding that § 83-1,107 requires the Director to personally approve forfeitures of good time and that this authority is nondelegable ....

The statutory provisions relevant to the instant case set forth the authority of the Director to delegate his duties even more explicitly than the statute upon which we relied in Fulmer[2], supra. Like the statute at issue in Fulmer, § 83-1,107 explicitly assigns the duty of reviewing forfeiture of good time to the Director. However, Neb. Rev. Stat. § 83-173(4) and (5) (Reissue 1999) specifically provides that the Director of the DCS shall "[a]ppoint and remove the chief executive officer of each [correctional] facility and *delegate*

---

[2]Fulmer v. Jensen, 221 Neb. 582, 379 N.W.2d 736, 739 (1986).

6

*appropriate powers and duties to him or her*" and "[a]ppoint and remove employees of the department and *delegate appropriate powers and duties to them*." (Emphasis supplied.) Neb. Rev. Stat. § 83-177 (Reissue 1999) further provides, in relevant part, that [d]eputy or associate wardens or assistant superintendents in each facility shall advise and be responsible to the chief executive officer of the facility and *shall have such powers and duties as the chief executive officer delegates to them* in accordance with law or pursuant to the directions of the director. (Emphasis supplied.) That authority has been exercised, as relevant to this appeal, by 68 Neb. Admin. Code, ch. 6, § 007 (2000), which provides that "[t]he disciplinary committees of each facility shall conduct hearings, render decisions, and impose appropriate penalties for violations of the Code of Offenses, with the review and approval of the Chief Executive Officer or designee." See, also, 68 Neb. Admin. Code, ch. 6, § 008 (2000) (committees may impose loss of good time)....

While § 83-1,107 provides that good time may be "forfeited ... by the chief executive officer of the facility with the approval of the director," we do not read § 83-1,107 as excepting the duty to approve the forfeiture of good time from their authority to delegate duties, derived from the general principles of administrative law we explained in <u>Fulmer v. Jensen</u>, 221 Neb. 582, 379 N.W.2d 736 (1986), and expressly set forth in §§ 83-173 and 83-177. In other words, the Department, by setting up a practical system of determining the forfeiture (or nonforfeiture) of good time with due process fully preserved, has in no way abdicated its power and responsibility, and in fact "'preserve[d] for itself the right to make the final decision.' "

As I noted in filing no. 46, the Nebraska Supreme Court in <u>Martin</u> upheld the delegation of the power to approve the forfeiture of an inmate's good time credit by the Director of DCS. While the plaintiff complains of a different delegation of authority, i.e., by the warden of his institution, the plaintiff has not explained why his reliance on Neb. Rev. Stat. § 83-4,114.01 makes any difference, as the Nebraska Supreme Court has already determined in <u>Martin</u> that the power to approve the forfeiture of good time credit may be delegated. The plaintiff has not explained why this court could come to a different conclusion from that reached by the Nebraska Supreme Court on a matter of state law. Moreover, "a violation of state law, without more, does not state a claim under the federal

7

Constitution or 42 U.S.C. § 1983," Bagley v. Rogerson, 5 F.3d 325, 328 (8th Cir. 1993), and the Eleventh Amendment to the United States Constitution deprives federal courts of jurisdiction over claims for injunctive relief to require state officials to conform to state law. Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 106 (1984).

### Due Process

In cross-motions for summary judgment (filing nos. 59, 61, 63, 64) and supporting briefs and evidence, the parties seek summary judgment on the plaintiff's claims of deprivation of procedural due process. "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." Wilkinson v. Austin, 125 S.Ct. 2384, 2393 (2005). Thus, claims regarding the right to either procedural or substantive due process must begin with identification of a protected liberty or property interest. Singleton v. Cecil, 176 F.3d 419, 424-25, 425 n. 7 (8th Cir.) (*en banc*), cert. denied, 120 S.Ct. 402 (1999).

In Nebraska, deprivation of a prisoner's good time credit implicates a liberty interest sufficient to require due process. Dailey v. Nebraska Dept. of Corr. Servs., 578 N.W.2d 869, 873 (1998). See generally Wolff v. McDonnell, 418 U.S. 539, 557-58 (1974) (when a state provides a right to good time and specifies the methods of forfeiture, an inmate has a constitutionally-protected liberty interest entitling him or her to procedures designed to ensure that the state-created right is not arbitrarily abrogated). However, a prisoner facing a loss of good time credit is not entitled to the full panoply of procedural safeguards that attend a criminal prosecution. Id. at 566.

To satisfy the constitutional requirements of due process, a prisoner facing a loss

of good time credit must be given (1) advance written notice of the charges, (2) an opportunity to present witness testimony and other evidence, and (3) a written explanation of the ultimate resolution of the charges. Espinoza v. Peterson, 283 F.3d 949, 951-52 (8th Cir.), cert. denied, 537 U.S. 870 (2002). In addition, a decision to discipline the inmate must be supported by "some evidence." Superintendent, Mass. Correctional Inst. v. Hill, 472 U.S. 445, 454 (1985).[3]

In Wilkinson v. Austin, 125 S.Ct. 2384 (2005), having determined that a liberty interest existed in the prison setting addressed in that case, the United States Supreme Court explained that the process which is "due" is to be determined by applying the framework of Mathews v. Eldridge, 424 U.S. 319 (1976), which requires a court to consider three factors.

> Because the requirements of due process are "flexible and cal[l] for such procedural protections as the particular situation demands," Morrissey v. Brewer, 408 U.S. 471, 481... (1972), we generally have declined to establish rigid rules and instead have embraced a framework to evaluate the sufficiency of particular procedures. The framework, established in Mathews v. Eldridge, 424 U.S. 319 ... (1976), requires consideration of three distinct factors: "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Id., at 335.

Wilkinson v. Austin, 125 S.Ct. at 2395.

---

[3]The plaintiff alleges that the defendants conducted an insufficient factual investigation before holding an evidentiary hearing and that he was allowed to call only three witnesses instead of the six he wished to present. The requirements of procedural due process do not mandate the timing or extent of a factual investigation to be conducted by correctional officials before an evidentiary hearing on a charge of misconduct. The plaintiff's issue concerning the number of witnesses at his evidentiary hearing is discussed later in this Memorandum and Order.

9

As interpreted in Westefer v. Snyder, 422 F.3d 570, 588-89 (7th Cir. 2005), the first of the Mathews factors, "the private interest of the prisoner to be free from confinement, while 'more than minimal,' ha[s] to be evaluated in the context of the prison system where, pursuant to a lawful sentence, confinement already has curtailed liberty to a great degree .... The private liberty interest, then, is clearly not as plenary as that of an individual not under the sentence of a court."  The second factor, minimizing the risk of error, was satisfied, at least in Wilkinson v. Austin, by notice and hearing, opportunity to submit a rebuttal to an affirmative recommendation, and three levels of review, with a statement of reasons for use before the next decision-maker.  As to the third of the Mathews factors: "The Court minced no words in applying the third Mathews factor, the interest of the public officials charged with the responsibility of running prisons .... The State's first responsibility, the Court wrote, is to ensure the safety of guards, prison personnel, the public and the prisoners themselves. The Court also noted the pressing need of the State to manage prudently its assets in a context of scarce resources. Therefore, concluded the Justices, courts must approach estimations such as the one required by the third prong of the Mathews test with substantial deference to prison management decisions."  Westefer v. Snyder, 422 F.3d at 588-89, *citing* Wilkinson v. Austin, 125 S.Ct. at 2396-97.

Weighing those factors, I determine that the defendants met the fundamental requirements of due process, i.e., an opportunity to be heard at meaningful times and in a meaningful manner, in connection with the plaintiff's disciplinary proceedings in this case. The record of the disciplinary charges, proceedings and orders on appeal is attached to filing no. 66.

On April 17, 2000, Caseworker Joseph Wilson awoke the plaintiff at approximately

10

7:30 a.m., which was earlier than the plaintiff usually rose. Wilson demanded that the plaintiff clear off the top of a locker in the plaintiff's cell. The exchange between the two deteriorated and resulted in misconduct report ("MR") 2813 in which Wilson charged the plaintiff with seven counts of rules infractions. MR 2813 charged: (1) aggravated assault/assault/fighting; (2) disobeying a direct order; (3) use of threatening language/gestures; (4) flare of tempers, minor physical contact; (5) swearing, cursing/use of abusive language/gestures; (6) disruption of authorized duties; and (7) violation of regulations.

The plaintiff appeared at a hearing before an investigating officer on April 17, 2000, at which he made no comment and did not request representation. The misconduct report was not dismissed, and the plaintiff was notified in writing that an evidentiary hearing before the Institutional Disciplinary Committee ("IDC") would take place on May 5, 2000.

Thereafter, the IDC, chaired by Michelle Rose-Seeman, held an evidentiary hearing on May 5, 2000. The plaintiff asked for and received representation. Inmate Clifton B. Smith assisted and represented the plaintiff before and during the hearing.

The plaintiff requested the presence of six witnesses. One, Mr. Berke, refused to attend the hearing for reasons which are not explained in the record. At the hearing, the plaintiff testified at length and pointed out discrepancies and inconsistencies in Wilson's account of the events. The plaintiff was also permitted to question Wilson and three eyewitnesses in person, although posing his questions through Ms. Rose-Seeman. The IDC admitted written evidence including an incident report by Sergeant Connelly who witnessed the very end of the exchange between the plaintiff and Wilson.

Ms. Rose-Seeman concluded, after receiving documentary evidence and hearing

the testimony of three inmate witnesses, the plaintiff and Wilson, that any further eyewitness accounts would be cumulative. She then ruled in favor of the plaintiff on Counts II through VII of MR 2813, dismissing those counts, and she ruled against the plaintiff on Count I, imposing a penalty of 90 days loss of good time and 60 days of disciplinary segregation, with credit for time served.

The plaintiff appealed the decision of the IDC to the DCS Appeals Board. The Appeals Board affirmed, finding that "some competent, material, and substantial evidence exists to support the disciplinary committee's finding of guilt" on Count I of MR 2813, and that the plaintiff received the procedural due process mandated by law. (See filing no. 66-2 at 34.)   The plaintiff filed an appeal to the District Court of Lancaster County, Nebraska, Case No. CI00-2355. After an evidentiary hearing conducted by telephone, the District Court affirmed the agency decision. (See filing no. 66-3 at 1.)   Thereafter, the Nebraska Court of Appeals dismissed the plaintiff's appeal for lack of jurisdiction. (See filing no. 66-4 at 1.)

The disciplinary conviction at issue was for violation of Rule 5-I-C of the DCS Code of Offenses, Neb. Admin. R. & Regs. Tit. 68, Ch. 5, § 005, which stated in May of 2000, as it does today:

> Aggravated Assault/Assault/Fighting. Assault on another person which causes pain or bodily injury, threatened assault, fighting with another person resulting in serious bodily injury, spitting or throwing bodily waste or fluids on another person, or sexual assault.

(See filing no. 66-2 at 57-58.)   See generally Witmer v. Nebraska Dept. of Correctional Services, 691 N.W.2d 185, 189 (Neb. App. 2005):

> When viewing the entirety of the regulation, the aggravated assault/assault/fighting regulation, DCS rule 5-I-C, contains various acts

12

constituting the offense, including (1) assault on another person which causes pain or bodily injury, (2) threatened assault, (3) fighting with another person resulting in serious bodily injury, (4) spitting or throwing bodily waste or fluids on another person, and (5) sexual assault. The offenses under DCS rule 5-I-C vary greatly in degree as to the type of harm or injury resulting from the offense – fighting resulting in serious bodily injury to threatened assault resulting in no injury. Despite the lack of injury in some situations, all of the various acts listed under DCS rule 5-I-C are considered Class I offenses. If the IDC finds the offense to be serious or flagrant, a Class I offense is punishable by confinement in disciplinary segregation for a period of time not exceeding 60 days and/or loss of good time not exceeding 1 year. 68 Neb. Admin. Code, ch. 6, § 008.01 (2000). Under DCS rule 5-I-C, the same punishment may result for any of the offenses, regardless of whether there is any injury.

The record indicates that the plaintiff received advance written notice of the charges against him, an opportunity to present the testimony of at least some witnesses and other evidence, and a written explanation of the ultimate resolution of the charges. The plaintiff protests that he was denied due process in the form of the testimony of additional witnesses. However, as the Chairperson of the IDC clearly assumed that the witnesses who did not testify would have given evidence in favor of the plaintiff, it is not clear how the plaintiff sustained any prejudice from the absence of the additional testimony. In fact, the assumption by the IDC that the additional witnesses would have corroborated those who did testify probably contributed to the dismissal of six of the seven counts against the plaintiff.

The remaining question is whether "some evidence" in the record supports the disciplinary determination of May 5, 2000. Superintendent, Mass. Correctional Inst. v. Hill, 472 U.S. at 454; Espinoza v. Peterson, 283 F.3d at 952. I conclude that there was adequate evidence to support the disciplinary decision. Sergeant Connelly reported a "loud discussion" between the plaintiff and Wilson, and when Wilson told Cass to leave the

13

bay, "Cass *yelled* 'fine.'" (Filing no. 66-2 at 10, emphasis added.) Inmate Richard Vachel testified that the plaintiff "cussed a couple times" and that "[t]here was just a lot of verbal stuff." (Filing no. 66-2 at 18, 19.) Inmate Gerald Tlamka stated that "[t]here was some words some back and forth." (Filing no. 66-2 at 20.) Inmate James L. Fisher heard "loud talking." (Filing no. 66-2 at 24.) In light of the testimony of all of the eyewitnesses that the plaintiff and Wilson were shouting at each other or were "loud," the record contains sufficient evidence to support a decision by the IDC that the plaintiff engaged in at least fighting words, i.e., "threatened assault resulting in no injury," a violation of DCS rule 5-I-C. Witmer, 691 N.W.2d at 189. As none of the other allegations by Wilson were supported by the evidence, the remaining six charges were properly dismissed.

Having concluded that the record reveals no deprivation of procedural due process, I deny the plaintiff's Motions for Summary Judgment (filing nos. 59, 61 and 63), and I grant the defendants' Motion for Summary Judgment (filing no. 64) insofar as filing no. 64 is consistent with this Memorandum and Order. Judgment will be entered accordingly.

SO ORDERED.

DATED this 18th day of October, 2005.

BY THE COURT:

s/ Joseph F. Bataillon
JOSEPH F. BATAILLON
Chief District Judge